# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| 68V BTR HOLDINGS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 22-0430-WS-B |
| | ) |
| CITY OF FAIRHOPE, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter is before the Court on the motion of the individual defendants ("the Commissioners") for summary judgment. (Doc. 134).[1] The parties have filed briefs and other materials in support of their respective positions, (Docs. 131, 134, 141, 148), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted.


## BACKGROUND

Familiarity with the pleadings, and with other motions and orders, is assumed. According to the second amended complaint, (Doc. 95), the plaintiff is the owner of two parcels of property ("Skyline" and "Gables," collectively, "the Properties"). The entity defendants are the City of Fairhope ("the City") and the City of Fairhope Planning Commission ("the Commission"). The Commissioners are members of the Commission. The Properties lie outside the corporate limits of the City but within its planning jurisdiction. The plaintiff sought approval from the Commission for development of the Properties for multi-occupancy housing ("the Projects"), but the Commission, by vote of the Commissioners, denied the plaintiff's applications.

---

[1] The entity defendants' embedded motion for summary judgment will be resolved by separate order.

The second amended complaint presents two claims against the Commissioners. Count IV asserts a claim for "tortious interference with vested rights," while Count V is a claim for "civil conspiracy."  (Doc. 95 at 31-37).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*.  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact."  *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact

2

or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). "Therefore, the [non-movant's] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).   Moreover, "a passing reference to an issue in a brief [i]s insufficient to properly raise that issue." *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326, 1331 n.4 (11th Cir. 2005).  The Court accordingly limits its review to those arguments the parties have expressly and adequately advanced.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to *particular parts* of materials in the record," and "[t]he Court need consider only the cited materials …."  Fed. R. Civ. P. 56(c)(1)(A), (c)(3) (emphasis added).  By local rule, "[t]he movant must file a brief that includes … all facts relied upon, each supported by a specific, pinpoint citation to the record," Civil Local Rule 56(a)(1), and the Court need not consider factual assertions unsupported by such pinpoint citations. *Jones v. Unity Behavioral Health, LLC*, 2021 WL 5495578 at *1, *4 (11th Cir. 2021).  As this Court has noted, "[t]he Court will not scour an entire deposition transcript to seek out evidentiary support for defendant's statement." *Ivy Marine Consulting, LLC v. Monarch Energy Partners, Inc*., 2019 WL 1173356 at *4 (S.D. Ala. 2019); *accord*

*Foster v. Bridgestone Americas Tire Operations, LLC*, 2013 WL 1363962 at *5 n.12 (S.D. Ala. 2013).

## I. Tortious Interference with Vested Rights.

Count IV alleges that the City's subdivision regulations ("the Regulations") constituted a representation by the City and the Commission to the plaintiff that the Projects, so long as designed in accordance with the Regulations, would be entitled to approval by the Commission. The plaintiff acted in reliance on this representation by purchasing the Properties. The Projects complied in all respects with the Regulations, thus entitling the plaintiff as a matter of law to approval of its applications. The Commissioners, with knowledge that the plaintiff possessed a "vested right to approval," intentionally interfered with the plaintiff's vested interest by withholding such approval. (Doc. 95 at 32-33).[2]

The Commissioners argue that Alabama has not recognized, and would not recognize, a cause of action for intentional interference with vested rights. (Doc. 134 at 85-86). The plaintiff asserts that such a claim has twice been recognized, (Doc. 141 at 86), but that is incorrect. As discussed in the Court's order on motion to dismiss, the

---

[2] Count IV of the second amended complaint includes two paragraphs of allegations that appeared only in Count V of the first amended complaint, which claim the Court previously dismissed. (Doc. 38 at 28-31; Doc. 70 at 12-14, 21; Doc. 95 at 32). The Court granted the plaintiff's motion for leave to file a second amended complaint, (Doc. 91), but the plaintiff represented to the Court that the only alterations being made by the amendment were to the civil conspiracy count, (Doc. 77), and its proposed second amended complaint, which highlighted the changes being sought, did not highlight the subject two paragraphs. (Doc. 77-7 at 32). Because the plaintiff did not seek or obtain leave to file a second amended complaint containing the subject two paragraphs, they are not part of the second amended complaint or this lawsuit.

Count IV also includes allegations that the entity defendants, through the Regulations, fraudulently misrepresented that multi-occupancy projects are subject to the Regulations regardless of whether any division of property is planned. (Doc. 95 at 33-34). The plaintiff disavowed any claim based on these allegations, (Doc. 52 at 2, 10), and the Court previously dismissed any such claim from the first amended complaint. (Doc. 69 at 2 n.1, 18). The allegations therefore should not have been included in the second amended complaint, as they are no longer part of the lawsuit.

plaintiffs in *Lee v. Houser*, 148 So. 3d 406 (Ala. 2013), asserted such a cause of action, but the Alabama Supreme Court "did not address the tortious interference claim in any fashion."  (Doc. 70 at 4).  The plaintiff in *BVCV High Point, LLC v. City of Prattville*, 2022 WL 3716592 (M.D. Ala. 2022), brought no state claim for tortious interference with vested rights; instead, it raised a federal takings claim, the governing analysis of which required the Court to consider "the extent to which the regulation interfered with the landowner's reasonable investment-backed expectations."  *Id*. at *6 (internal quotes omitted); *accord id*. at *9.

Neither the parties nor the Court have been able to discover any Alabama case recognizing a cause of action for intentional interference with vested rights.  The question becomes whether the Alabama Supreme Court would recognize such a cause of action were the issue presented to it.[3]  More precisely, the question is whether that tribunal would recognize such a cause of action with elements the plaintiff is capable of satisfying.

Alabama recognizes the tort of "intentional interference with contractual or business relations."  *Ex parte Hugine*, 256 So.3d 30, 60 (Ala. 2017).  The Commissioners argue that, were the Alabama Supreme Court to recognize a tort of intentional interference with vested rights, its elements would mirror those of the existing tort of intentional interference with contractual or business relations.  (Doc. 134 at 85).  The plaintiff expresses no disagreement with this proposition, and the Court considers the extrapolation appropriate.

"The essential elements of the tort of intentional interference with contractual or business relations are:  (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage."  *Ex parte Hugine*, 256 So. 3d at 60 (internal quotes omitted).  "Stranger" is equivalent to "interloper, or meddler."  *Waddell*

---

[3] "We decide novel questions of state law the way it appears the state's highest court would."  *SE Property Holdings, LLC v. Welch*, 65 F.4th 1335, 1342 (11th Cir. 2023) (internal quotes omitted).

*& Reed, Inc. v. United Investors Life Insurance Co*., 875 So. 2d 1143, 1157 (Ala. 2003) (internal quotes omitted).[4]  A "stranger" is equivalent to a "third party," which is the opposite of a "party in interest" to the relationship.  *Id*. at 1154.  As relevant here, "[a] defendant is a party in interest to a relationship if the defendant has any … control over … that relationship."  *Id*.

In the context of a claim for intentional interference with vested rights, the third element would require that the defendant be a stranger to the vested right.  The Commissioners argue that, if a claim for intentional interference with vested rights existed, the plaintiff could not satisfy this third element.  (Doc. 134 at 85).  The Court agrees.

The plaintiff claims that, by presenting projects complying with all applicable requirements, it obtained a "vested right to approval" of its applications by the Commission, with which right the Commissioners interfered by withholding such approval.  By the plaintiff's own allegations, the Commissioners could not be strangers to the plaintiff's alleged vested right, because that right is alleged to be a right to have the Commissioners themselves (as the Commission) act (favorably) on the applications.  The Commissioners cannot be interlopers or meddlers with respect to the plaintiff's claimed right to a favorable ruling, since they are charged by law to make rulings on such applications[5] (which also means they have a measure of control regarding approval).  Even if the Commissioners denied the applications for wrong reasons and/or motives, that would satisfy only the fourth, "intentional interference" element of the tort, not the third, "stranger" element.  Because they had a legal right and duty to act on the applications, and because their alleged wrong is not in acting at all but in acting in a manner unfavorable to the plaintiff, as a matter of law the plaintiff could not satisfy the third element of a claim for intentional interference with vested rights, even were the

---

[4] An interloper is one who "meddle[s] in the affairs of others," while a meddler is one who "intrude[s] in other people's business or affairs."  Webster's New College Dictionary 592, 696 (3rd ed. 2008).

[5] Ala. Code § 11-52-32(a).  The plaintiff admits as much.  (Doc. 95 at 7).

Alabama Supreme Court to recognize such a claim.  The plaintiff offers no argument to the contrary.

## II.  Civil Conspiracy.

Count V alleges that the Commissioners conspired among themselves, and with the Commission, the City, and several outsiders, for the purpose of preventing approval of the plaintiff's applications regardless of whether they complied with all applicable requirements.  (Doc. 95 at 16-18, 35-37).  Although Count V does not state whether it is brought under state law, federal law, or both, the Commissioners do not contest the plaintiff's confirmation that it is brought under both.  (Doc. 53 at 19).  Nor do the Commissioners take issue with the Court's previous pronouncement to that effect.  (Doc. 70 at 14).

The Commissioners first argue that, under both state and federal law, a failure of the underlying substantive claim dooms a conspiracy claim.  (Doc. 134 at 87).  The plaintiff does not disagree.  Under federal law, "[t]o sustain a conspiracy action under section 1983, a plaintiff must show an underlying actual denial of his constitutional rights," and if the substantive claim fails, the federal conspiracy claim fails as well. *Myers v. Bowman*, 713 F.3d 1319, 1332 (11th Cir. 2013) (internal quotes omitted).  The only remaining federal claim in this lawsuit – a substantive due process claim brought against the entity defendants – is being dismissed by separate order on those defendants' motion for summary judgment.  To the extent based on federal law, the plaintiff's civil conspiracy claim therefore must also be dismissed.

"Liability for civil conspiracy [under Alabama law] rests upon the existence of an underlying wrong[,] and if the underlying wrong provides no cause of action [as when it is dismissed on motion for summary judgment], then neither does the conspiracy." *Flying J Fish Farm v. Peoples National Bank*, 12 So. 3d 1185, 1196 (Ala. 2008) (internal quotes omitted).  As explained in Part I, the plaintiff's only surviving substantive state claim against the Commissioners is due to be dismissed.  However, several state claims remain pending against the Commission and the City, and the Commissioners make no

argument that their liability for civil conspiracy cannot rest on an underlying wrong alleged against the Commission but not the Commissioners.

Instead, the Commissioners argue that the state conspiracy claim fails for lack of evidence the Commissioners – any of them – reached an agreement – with anyone – to improperly deny the plaintiff's applications. (Doc. 134 at 88-90). "In order to prove conspiracy, a plaintiff must allege and prove that the defendant … agreed with at least one other coconspirator … to accomplish an unlawful end … and intended to have that unlawful end brought about." *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996). "The essence of a conspiracy is an agreement, a meeting of the minds between the conspirators. …. One cannot inadvertently become a member of a civil conspiracy. …. The plaintiff must allege and prove that the alleged conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy." *Id*.

As addressed in a prior order, Alabama recognizes the intra-corporate conspiracy doctrine. *M & F Bank v. First American Title Insurance Co*., 144 So. 3d 222, 234 (Ala. 2013). That doctrine precludes an actionable civil conspiracy where all conspirators are employees or agents of the same entity, including a public entity. *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010) (cited in *M & F Bank*, 144 So. 3d at 234). This doctrine requires that at least one of the conspirators be an outsider to the Commission. (Doc. 70 at 14-16). The parties further agree that, in order to establish a claim of civil conspiracy, the plaintiff must show that a majority of the voting Commissioners were members of the conspiracy. (Doc.141 at 89-90; Doc. 148 at 30).[6]

The plaintiff's evidence of an agreement among the Commissioners and others to wrongfully reject its applications even though they complied with all applicable

---

[6] They presumably do so because "[o]ur supreme court [has] explained the elements of conspiracy as follows: … (c) 'Overt act causing damage' …." *Reitzammer v. Peoples Savings Bank*, 689 So. 2d 913, 915 (Ala. Civ. App. 1995) (quoting *Snyder v. Faget*, 326 So. 2d 113, 119 (Ala. 1976)). If fewer than a majority of the voting Commissioners were members of the alleged conspiracy, their conspiracy presumably could not have caused the denial of the plaintiff's applications.

requirements, (Doc. 141 at 3-12, 89-90), with all reasonable inferences viewed in the light most favorable to the plaintiff, is addressed below.

Both the Gables and the Skyline applications came before the Commission at its February 7, 2022 meeting.  Prior to that meeting, planning department staff recommended denial of both applications.  (Doc. 131-4 at 35; Doc. 131-16 at 11).  On February 3, 2022, the plaintiff informed staff and the City's mayor that it wanted to table both projects to the March meeting.  (Doc. 131-17).  The Commission chair announced at the top of the February 7 meeting that the applications had been tabled by the plaintiff. (Doc. 131-15).

The Skyline application was considered at the April 4, 2022 meeting of the Commission.  The application was denied by a unanimous 5-0 vote.  (Doc. 125-32).  The Gables application was considered at the Commission's May 2, 2022 meeting.  The application was denied by a unanimous 8-0 vote.  (Doc. 125-33).

The plaintiff has evidence that three Commissioners (Hall-Black, Dyas, and Bryant) were in contact with outsiders opposed to the developments (Haynes, Ryan, Todia, and Wilson) before the February 7 meeting.  There is evidence from which a properly functioning jury could find that these outsiders acted in concert.  (Doc. 74-4 at 22; Doc. 125-4 at 1, 3).

In October 2021, Haynes texted Hall-Black that she and others were working hard to fight the Gables project, with Hall-Black responding that she would "help in anyway [sic] possible.  We have to be smarter and push these developers out of our neighborhoods."  (Doc. 74-4 at 18).  A few days later, Hall-Black advised Haynes they should "get [their] own traffic study."  (*Id*. at 22).  A few days after that, she suggested to Haynes that she "get EVERYONE to use" the road during the plaintiff's traffic study. (*Id*. at 25).

In October 2021, Ryan informed a landowner's group that it would be a good idea to approach Commissioners to seek their advocacy on how best to fight the Gables project.  He said that Todia knows two Commissioners and will discuss the matter with

them.  (Doc. 125-4 at 3-4).  A week later, Todia met with Dyas and discussed the Gables project.  (*Id*. at 9; Doc. 125-6 at 13).

Hall-Black and Wilson exchanged numerous texts and/or calls in November and December 2021, as did Dyas and Todia, but their content is unknown.  (Docs. 125-3, 125-9).[7]

On January 4, 2022, Todia met with Bryant and discussed the Gables project.  (Doc. 74-2 at 13; Doc. 125-6 at 20-21).  On January 26, 2022, Todia and Ryan met with Dyas and discussed the Gables project.  (Doc. 74-2 at 14; Doc. 125-6 at 25-26).  On February 6, 2022, Dyas spoke with Todia by phone twice; the content of these conversations is unknown.  (Doc. 125-9 at 1).

The February 7 meeting was scheduled for 5:00 p.m.  Early that afternoon, Wilson texted Hall-Black to "help me get these [Skyline and Gables applications] back on the agenda," because "[w]e have been fighting for weeks to get these two project[s] denied," and "[b]oth of these projects are up for denial!"  (Doc. 74-4 at 10).  Hall-Black responded, "There is nothing I can do to get them back on the agenda.  They were going to be denied anyways."  (*Id*.).  Wilson insisted that her neighborhood group wanted the applications denied that day and that the plaintiff got the applications taken off the agenda to avoid that result and to delay an adverse ruling in a lawsuit brought by the neighborhood group, and she asked whether the Commissioners "usually vote on whether something is tabled or not?"  (*Id*. at 11-12).  Hall-Black responded that she "posed the question to the entire commission when we got the agenda last week.  Beth was telling me about the case so when I saw it I asked the question.  However on the agenda they said staff recommends denial."  (*Id*. at 12).

---

[7] The plaintiff complains that the defendants did not turn over all the text messages reflected in the Hall-Black and Dyas logs from this or other time periods.  (Doc. 141 at 6 n.3, 7 10).  If that is so, it was incumbent on the plaintiff to pursue full production during discovery, including by appropriate motion to compel.  The plaintiff's only motion to compel, however, did not seek the material it now claims should have been produced.  (Docs. 96, 96-1).  The plaintiff does not ask the Court to draw an adverse inference from the non-production of these text messages and, under the circumstances noted above, such an inference would be inappropriate.

Dyas spoke with Todia by phone twice on February 7, prior to the meeting; the content of their conversation is unknown.  (Doc. 74-2 at 17; Doc. 125-9 at 1).  Shortly after the meeting concluded, Dyas spoke by phone with Ryan; again the content of their conversation is unknown.  (Doc. 125-9 at 1).

Between February 7 and May 2, 2022:  Hall-Black exchanged texts with Wilson on February 15, 16, 22, and 23, March 17, April 1, and May 2; Hall-Black exchanged texts with Todia on February 22; and Dyas exchanged texts with Todia on February 22; again the content of these communications is unknown.  (Doc. 125-3 at 1; Doc. 125-9 at 1).

The Commissioners argue that the foregoing evidence does not create a genuine issue of material fact as to whether Dyas or Bryant entered a conspiracy with any of the outsiders to wrongfully deny the plaintiff's applications regardless of whether they met all applicable requirements for approval.  (Doc. 134 at 89).  The Court concurs.

The plaintiff correctly notes that, "[b]y its very nature, the existence of a conspiracy must often be inferred from circumstantial evidence and the relationship of the parties, as opposed to direct evidence."  (Doc. 141 at 89 (internal quotes omitted)).  However, "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir 2005) (emphasis and internal quotes omitted).  "[P]urported 'evidence,' consisting of one speculative inference heaped upon another, is entirely insufficient to establish that [a defendant] joined the conspiracy."  *White v. City of Atlanta*, 449 Fed. Appx. 804, 806 (11th Cir. 2011) (internal quotes omitted).  Likewise, "vague speculation as to what the [defendants] discussed" when they talked to each other amounted to a "complete absence of evidence of any agreement" to violate the plaintiff's constitutional rights.  *Moody v. City of Albany*, 228 Fed. Appx. 859, 860-61 (11th Cir. 2007).

It is clear that Dyas and Bryant had communications (texts, calls, and/or meetings) with various configurations of the outsiders.  The plaintiff, however, has presented

11

minimal evidence of what was discussed during those interactions, and the little it has presented does not suggest an agreement to deny the applications regardless of merit.

The plaintiff offers no evidence of communication between any of the outsiders and Bryant except for her meeting with Todia in January 2022. The plaintiff's only offered evidence of what they said is Todia's statement that they met "[t]o discuss The Gables project, to inform her about our findings, the issues that we were finding with this project, to let her know where we were headed, and just want her to be informed, here's the rest of the information, you're getting information from the applicant, the developer, and it may look like all the boxes are checked, but here's some issues that show that the boxes are not checked. …. I told her what we were finding, the problems we were finding. I let her know about our zoning process, that we were in the process of going through that whole process with getting our district zoned and just informing her." (Doc. 125-6 at 20-21). No encouragement here to deny the applications regardless of compliance with all applicable requirements, much less a proposal to join forces to accomplish that result; instead, only a laying out of reasons the applications did *not* comply with all applicable requirements.

Two months earlier, Todia met with Dyas, and the plaintiff's only offered evidence of what they said is Todia's statement that she "wanted to make him aware of [the Gables application] and I wanted to get information from him about the zoning process. …. I just wanted to talk to him about yes, this project may be coming up, how is that gonna fit into our effort to get our district zoned …." (Doc. 125-6 at 13-14). She made it obvious that she was not in favor of the project, due to it being a high-density development in a rural community of acre-sized residential lots, which would bring traffic, storm water runoff, wetlands, and other issues. (*Id*. at 14-16). Again, nothing in this rendition remotely suggests a proposal to deny the application regardless of whether it met all applicable requirements, but only a listing of reasons neighbors would or did oppose the project.

Todia and Ryan met with Dyas in January 2022 to discuss the Gables project, but the plaintiff's only offered evidence of what they said is Todia's statement that, similar to

12

her meeting with Bryant, they brought Dyas "up to speed on where we were with our findings with the professionals ["traffic and sewage primarily"] we had looking at and scrutinizing this project and with where we were in the zoning process." (Doc. 125-6 at 25-26). Again, only a laying out of reasons the application did not satisfy all applicable requirements, not an invitation to agree to deny the application regardless of merit.

Todia and Dyas communicated by text and phone call on several occasions, but the plaintiff offers evidence as to the content of none of the phone calls and of only a few of the texts, which address nothing more than inviting Dyas to the three meetings discussed above, plus Todia's request to speak with Dyas shortly before the February 7 meeting. (Doc. 74-2 at 17; Doc. 125-4 at 7-12).

To compensate for this lack of evidence from the communications themselves that Bryant or Dyas joined a conspiracy with the outsiders to defeat its applications regardless of merit, the plaintiff points to records from the neighborhood group with which the outsiders were associated. Ryan advised the group that it would be a "good idea to approach city planning commission members who we think may be sympathetic to our situation and seek their advocacy and advice on how best to fight this proposal," with Todia intending to contact the two Commissioners she knew "to discuss and possibly meet with." (Doc. 125-4 at 3). The plaintiff describes the quoted statements as demonstrating that the "intent" of the meetings and other communications described above was as "efforts to prevent approval of the Projects." (Doc. 141 at 5). Even could this intent be ascribed to the Commissioners simply because the outsiders held it, an intent to prevent approval is not evidence of an intent to prevent approval regardless of the rules, any more than a sports team's intent to win the game is evidence of its intent to win by cheating.[8]

_____

[8] The plaintiff says that Bryant's meeting (but not Dyas's two meetings) violated the Commission's by-laws. (Doc. 141 at 7 n.8). The plaintiff, however, does not argue that any such violation is evidence that, contrary to Todia's testimony, the meeting included discussions about denying the plaintiff's applications regardless of compliance with applicable requirements and/or an agreement to do so.

The Commissioners present a similar argument as to Hall-Black, but the evidence concerning her is more colorable.  The plaintiff has evidence that Hall-Black and Haynes texted on multiple occasions in October 2021.  Hall-Black expressed sympathy for opponents of the Gables project and advised Haynes to conduct a traffic study.  There is also evidence she encouraged Haynes to skew the results of the plaintiff's traffic study by generating artificially high vehicle counts.  (Doc. 77-4 at 18, 22, 25).  The plaintiff describes this material as evidence that Hall-Black "devised a plan to cheat a developer's traffic study … in order to make the development application non-compliant with said [subdivision] Regulations to falsely justify denial," (Doc. 141 at 4), a characterization the Commissioners do not challenge.  And from a willingness to manufacture a reason to deny the application, a reasonable inference may arise of a willingness to vote against a fully compliant application.

Even granting all the foregoing for purposes of argument only, it takes two to conspire, and the plaintiff has presented no evidence either that Hall-Black proposed that the applications be denied regardless of merit or that Haynes (or any other outsider) agreed with Hall-Black to pursue such an objective.[9]  Haynes in her text response certainly did not do so, (Doc. 77-4 at 26), and the plaintiff does not suggest that she said or did anything else indicating agreement with Hall-Black's hypothetical proposal.

For reasons laid out above, the plaintiff has failed to demonstrate the existence of a genuine issue of material fact as to whether any Commissioner agreed with any outsider to reject the plaintiff's applications despite full compliance with all applicable requirements.  That alone is sufficient to require dismissal of the plaintiff's state-law conspiracy claim.  However, even had the plaintiff shown such a genuine issue as to Bryant, Dyas, and/or Hall-Black, that would implicate only one, two, or three Commissioners in the conspiracy and, by the plaintiff's concession, its claim can succeed only if a majority of the votes were cast by co-conspirators.  As discussed below, the

---

[9] The plaintiff has no evidence that Hall-Black was in communication with any other outsider than Wilson and, except for their exchange on February 7, 2022, the plaintiff has no evidence as to the content of those communications.

14

plaintiff has failed to raise a genuine issue of material fact as to whether any other Commissioners joined the alleged conspiracy.

As noted, all eight voting Commissioners voted to deny the Gables application, including Bryant, Dyas, and Hall-Black.  (Doc. 125-33).  The plaintiff therefore must show that at least two other voting Commissioners were members of the alleged conspiracy.  All five voting Commissioners voted to deny the Skyline application, including Bryant and Dyas.  (Doc. 125-32).  The plaintiff therefore must show that at least one other voting Commissioner was a member of the alleged conspiracy.  The plaintiff tries four different ways to get there.

First, the plaintiff notes Hall-Black's February 7 text to Wilson that the projects "were going to be denied anyways." (Doc. 74-4 at 10).  The plaintiff asks how Hall-Black could know the applications were going to be denied "unless there was agreement amongst a majority of the Commission to deny the applications?"  (Doc. 141 at 90).  There is no mystery here:  because, as Hall-Black noted, staff had just recommended denying both applications, (Doc. 77-4 at 11), she could of course comfortably predict that the Commission would follow suit.

Second, the plaintiff points to Hall-Black's statement in the same text string that "I posed the question to the entire commission."  (Doc. 77-4 at 12).  The plaintiff assumes this statement was in response to Haynes' statement that "we want them [the applications] to be denied," (Doc. 141 at 89), (presumably to show that Hall-Black talked to other Commissioners about denying the applications), but that is not a reasonable reading of their correspondence.  The only questions asked by Haynes were, "The only people who have the authority to table something is the planning commission itself, right?" and "Don't you guys usually vote on whether something is tabled or not?"  Moreover, the only assistance Haynes requested was to "help me get these back on the agenda."  (Doc. 77-4 at 10-11).  "[T]he question" Hall-Black "posed … to the entire

Commission" plainly was the question Haynes was asking:  were the applications properly tabled and can they be placed back on the agenda?[10]

Third, the plaintiff relies on certain remarks by Bryant and others at the conclusion of the February 7 meeting.[11]  According to the plaintiff, "the Commission admits that there is no 'reason' to deny the application but that they could 'just deny' the application anyway because they did not want Plaintiff's multi-occupancy complexes built."  (Doc. 141 at 9).  The plaintiff continues that the Commission "acquiesced" in Bryant's "plan" by later voting to deny the applications.  (*Id*. at 9, 89-90).  The plaintiff's position is untenable at each point.

At the conclusion of the February 7 meeting, Dyas questioned the city attorney about the interplay between the tabling of the plaintiff's applications until at least April and an imminent February 15 vote to ratify a county zoning program in the area including the Gables property.  The city attorney expressed his opinion that, because they were submitted before any county zoning existed and remained pending after tabling, the applications would still be subject to the City's regulatory framework as it existed at the time the applications were filed, but that, were the Commission to deny the applications, any new applications would be subject to whatever regulatory framework was then in place.  (Doc. 131-19 at 4-10).  Dyas predicted that the county, and county residents, would not take kindly to the Commission, after county zoning was approved, approving a massive development in an area that the county probably would not zone for such developments.  (*Id*. at 10-11).[12]

---

[10] The plaintiff attempts to undermine this conclusion by describing an excerpt from Hall-Black's deposition.  (Doc. 141 at 9 n.11).  Because the plaintiff did not place this excerpt in the record, (Docs. 125-42, 128-4), it cannot be considered.  See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by … citing to particular parts of materials *in the record* ….") (emphasis added).

[11] The plaintiff asserts that the remarks preceded the meeting, (Doc. 141 at 9, 89), but that is clearly incorrect.  (Doc. 131-19).

[12] As proposed by the Commissioners without objection from the plaintiff, (Doc. 134 at 10 n.5), the Court has carefully listened to the recording of the February 7 meeting on YouTube,

The conversation continued as follows, with a good bit of speakers talking over each other:

| | |
|---|---|
| Bryant: | Unless it gets denied. |
| City attorney: | I hear what you're s – |
| Commissioner: | I'm sorry? |
| Bryant: | Unless we just – it gets denied. |
| Commissioner: | There's a lot of applications that get denied. |
| Dyas: | Oh, I know, but you gotta have a reason to deny it – |
| Bryant: | Yeah. |
| Dyas: | – and you're taking this back now and then trying to figure – |
| Hall-Black: | Well, what was our reason [unintelligible] |
| Dyas: | – that's another issue that we – |
| Commissioner: | I don't think there's anything else we can say.[13] |

It is immediately apparent that Bryant did not "propos[e] the idea … that the Commission should deny Plaintiff's development applications before [they] were ever even submitted." (Doc. 141 at 89). All Bryant did was point out the obvious, based on what the city attorney had just said: that Dyas's hypothetical concern with upsetting the county and county residents would arise only if the applications were approved, not if they were denied.

It is further obvious that no one admitted the absence of any reason to deny the applications – a bizarre suggestion, given that staff had just submitted detailed reports recommending denial of the applications. It is equally obvious that no one indicated that they (as opposed to the county or county residents) did not want the complexes built.

---

and the Commissioners' transcript of the February 7 meeting is essentially a verbatim repetition of the video to this point.

[13] Both the Commissioners' transcript, (Doc. 131-19), and the plaintiff's transcript, (Doc. 95-1), contain significant errors regarding this portion of the meeting. Reflected in text is the actual dialog and sequence as captured on the YouTube video.

Finally, even could it be maintained (and it cannot) that Bryant proposed that the Commission deny the plaintiff's applications without any valid reason, a conspiratorial agreement to do so cannot reasonably be inferred simply from other Commissioners later voting (two and three months later) to deny the applications.  No Commissioner expressed agreement with Bryant's (non-existent) plan, none was under a duty to expressly repudiate it, all received much information and opinion regarding the applications when they came before the Commission, and each Commissioner was faced with an individual, binary choice whether to approve or disapprove the applications.  An assertion of conspiratorial agreement resting, as here, on parallel conduct requires evidence of "something other than individual self-interest" behind such conduct,[14] and an innocuous sentence amidst the hubbub of a late-meeting discussion is far too slender a reed to satisfy that requirement.  Simply to declare, as the plaintiff does, that the "only reasonable inference" is that "additional, non-documented conversations took place between the Commissioners [after February 7] concerning a plan to deny the development," (Doc. 141 at 10), is to descend into hopeless speculation.[15]

The plaintiff's final effort to show a conspiratorial agreement extending to a majority of voting Commissioners is the transcript of a clandestine recording of Commissioner MacKellar made in June 2022 by an agent of the plaintiff masquerading as a new resident seeking housing advice.  According to the plaintiff, MacKellar admitted that "the Commission [*i.e.*, "as a whole"] denied [the] applications for pretextual reasons," in particular, "health and safety and traffic," while the real reason for the Commission's action was "because they simply did not want the specific multi-use complexes [the plaintiff] sought to build."  (Doc. 141 at 11, 39, 89, 90).

---

[14] *ABB Turbo Systems AG v. Turbousa, Inc*., 774 F.3d 979, 987 (11th Cir. 2014) (describing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007)).

[15] This is especially so given the uncontroverted testimony of Commissioners Kohler, Martin, Langley, and MacKellar that they never discussed the Projects with any other Commissioner outside the formal meetings of February 7, April 4, and May 2.  (Doc. 131-49 at 5; 131-31 at 5; 131-37 at 4; 131-30 at 4-5).

Once again, the plaintiff's argument will not withstand scrutiny.  MacKellar said the Gables application was denied because "it just isn't a right fit and there's also a flood plain that comes through there, so we denied it off of um health and safety and the traffic that's coming in."  (Doc. 95-2 at 2).  She later reiterated that "[t]here's too much traffic coning in and out of there too much um watershed off of one big unit, and too much of an impact where it should have been everything else around that is residential, … so you can't put that kind of multi-family use in a residential area that doesn't have a commercial component."  (*Id*. at 4).

The plaintiff seizes on MacKellar's statement that "[t]here's other complexes that we have that are bigger and we haven't had an issues [sic] and it's because the apartment complexes are nicer and the rent is too much so you're not getting –."  (Doc. 95-2 at 2).  The plaintiff takes this to mean that the Commissioners rejected the Gables application because the project was not sufficiently upscale, but that is plainly wrong.  The plaintiff's spy pitched the story that he and his wife were renting where "the people that are around us are a little shady," (*id*.), and all MacKellar said was that the Fairhope area had nicer apartments without those issues.  Even if MacKellar's comment could reasonably be construed as a statement that the Gables project was too downscale to winnow out certain tenants, and even if it could support the inference that she personally voted against the Gables application on that basis, it cannot reasonably be read for the proposition that other Commissioners voted against it for the same reason, much less that they reached a conspiratorial agreement to do so.

In summary, there is no genuine issue of material fact as to whether any Commissioner, let alone a majority of Commissioners, joined a conspiracy to deny the plaintiff's applications whether or not they satisfied all applicable requirements.  As the plaintiff is thus unable to establish an essential element of its conspiracy claim, Count V is due to be dismissed.

**CONCLUSION**

For reasons set forth above, the Commissioners' motion for summary judgment is **granted**.  All claims against them are **dismissed with prejudice**.  Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 18th day of June, 2024.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE